May it please the Court, my name is Mike Jensen. I'm with the Attorney General's Office in the state of Nevada. I represent the three individually named defendants in this case, all of which are former law enforcement administrators for the Department of Public Safety who are being sued by the plaintiff for money damages, and we're seeking this Court to find that they are entitled to qualified immunity under the facts of this case. The core issue in this case, I would submit, is whether taking the facts in the light most favorable to Mr. McLellan, whether a reasonable law enforcement official would know that terminating Mr. McLellan's employment would violate the First Amendment. And that, my understanding, is supposed to be done in taking all of the facts and circumstances into consideration and making a determination whether the law was clearly established such that a reasonable official would know they were violating the law, that essentially the precedence places the question beyond debate, and essentially needs to be so particularized that an individual official would know that, in fact, they were violating that right, as opposed to what we believe occurred in this case, and that's why we've appealed this particular decision of the district court. We believe the district court erred in not doing the qualified immunity analysis, but instead by taking some of the facts in isolation outside of what were the totality of the circumstances and applying those in a way that I don't believe would have been reasonable for these particular law enforcement administrators to have engaged in. Can I ask a question about that? Yes. We have the Dahlia test for Part I of qualified immunity as to whether or not there was a constitutional violation, and it seems to me there's a real question, given that there were these repeated misstatements. Perhaps the first one was an attempt to lay a trap and investigate a crime or at least a wrongdoing, and then of course it continued after that, and I think that's undisputed at this point. So when we talk about the First Amendment analysis, there's a question about whether or not this person would have been fired anyway, and we could talk about that, I suppose. But when I put myself in the shoes of the supervising police officers, I wonder about prong two of qualified immunity, and specifically is it uncontested in this case that pursuant to Brady had this person gone forward with this job that the department would have had to produce this history of misstatements under oath any time this individual was called to testify? Your Honor, when you say is it uncontested, I believe it's clear in this case that those incidents would have to be disclosed in every case. I'm just wondering what happens then. Surely the department doesn't have an opportunity to give him a different job, and it strikes me that I'm not sure how he could go forward and do this job. That's essentially the point that we're making in our briefs to you, is that in this particular case, these law enforcement administrators, none of which had had any kind of a claim of corruption or illegal conduct leveled at them. They were just doing their job trying to figure out if Mr. McClellan should keep his job or not. And what they were confronted with was a series of multiple embellished, fabricated facts about an incident that never occurred. I don't know if it occurred or not, though. That part of the district court was clearly concerned that maybe there had been some wrongdoing. Maybe there was some involvement or concern about the union. Maybe there was some monkey business going on there. I guess my point is if we step over all of that and get to the point where it's uncontested, there were misstatements made under oath by, I'll say, a police officer. I think it was a trooper, a highway patrolman. At that point, it seems to me things change in a big way because I don't know how he can go forward and do the job. And I'll just let you both know that's my problem with this case, so you both have to have an opportunity to respond. I would agree, Your Honor, that that is definitely our position, that even if you agree that at its inception the statement at least had some suspicion backing it, that there was some kind of wrongdoing happening at the highway patrol by Mr. Stepien, and it was suspicion at best, as we pointed out. But there was Stepien's suspicion that there was funny business going on. Is that right? It wasn't. It was Stepien, Officer Stepien, was worried about funny business between the union and the Teamsters, and that may be why McClellan was investigating those trucks. Isn't that correct? That's how the whole event started. But what I was referring to is the specific statements that the district court was focused in on, which was the statements that were made at the roundtable meeting where he said that he had spoken to two individuals at Granite Construction. At the first roundtable or the second? At the first roundtable meeting where he said in that meeting, after being told that there was no order not to stop Granite Construction trucks, that there was no policy that was in place, that they had to ask for permission, after he was told that the information came through Stepien's wife about concerns that Granite had about the enforcement activity that happened, it was only at that point that Mr. McClellan made this statement where he said that he had called Granite Construction, talked to two high-level Granite Construction executives, and that he was told there was no complaint. That didn't happen. There was no telephone call. And he conceded that. So he subsequently conceded that he hadn't spoken to them. He did, but he didn't concede that at the time of the roundtable. He went to a second meeting with high-level NHP law enforcement officials, his chief, his regional commander, and his captain in his region, and he adamantly maintained that that telephone call occurred. And then he added facts to the telephone call, saying it lasted this long and it occurred at my house. And he still, even after that, he didn't clear it up. This went on for two and a half months. And then he went into an OPR interview, an internal affairs interview, where he was represented by counsel. He was admonished that if he didn't tell the truth that he could be fired. In that particular interview, he doubled down on the dishonesty. He essentially got he feigned outrage that this individual, he called him this civilian, would lie about something like this. He indicated that he thought something should happen to that individual for lying about it. And then he added to that a number of facts to embellish this incident, where he indicated where he was standing in the yard when this occurred, the time of day, bad cell phone reception that was happening at the time, that he had to get a call back at home, that he then went in his house. And then he describes this conversation, the content of which he says that there was actual discussion. And he puts words to that discussion in his OPR interview. And all of that was false. It all had been fabricated. Well, so what I was talking about earlier, the September 1 discussion, the September 2 roundtable, and that's the period of time during which it seems to me that their opposing counsel will have some ammunition to talk about whether there had been some misdeeds going on or some directions given that were perhaps not of pure motive. But then when you get to the September 10, September 16 incidents, it seems to me to be uncontested, and that's why I guess I don't spend a whole lot of time on it because it's an officer who's testifying falsely under oath repeatedly. And, in fact, when he was asked about those. Isn't that right? In other words, and I want you to correct me if I'm wrong, but I don't think we have to look too hard on September 1 or September 2. I would agree with that. In fact, the hearing officer heard the appeal on this case. That's exactly what he said, and in the record you'll find his decision. He said, even if you disregard the first roundtable, the meeting with his command officers, he was clearly in an employee capacity in that OPR interview, and he engaged in some broad-range deception. There's an indication in the briefing from the other side that there are other officers who were determined they had made statements that were incorrect or inaccurate. I don't think there's anything in the talks about a pejorious statement but an inaccurate statement and that those folks had not been terminated. So my question is whether there's any, especially in light of my concern about Brady and the ramifications, is there any other incident in the record of any other officer who had been found to lie under oath, who was kept on? The record has some limited information that was part of the motion for summary judgment. I think there were two or three incidents that Mr. McClellan provided to the court. Are those incidents where somebody said something under oath that was later determined to be false? No. In fact, in our response to those particular incidents, we provided the affidavit of Jackie Muth, who was the deputy director of the department at the time. Attached is her affidavit where she explains that none of those incidents were anywhere on the scale of this particular case, and in fact provided a matrix of different cases where I don't have that. That's all right. I'll find it. Go right ahead. There's a matrix in the record where they show that numerous cases where dishonesty was an alleged part of the misconduct where the agency had fired or terminated the individual based on the dishonesty and explain these couple of aberration type cases that Mr. McClellan provided as situations where things happened at the regional level, didn't make it up to the higher level, the highway patrol. There were differences not only in the level of dishonesty, but also with regard to what level the decisions were made at with regard to the dishonesty. Okay. I don't see anything here that's different than what you've already described. So, Your Honors, what I'd like to do is reserve a little bit of time, but with regard to this case, I would agree that when you look at the level of dishonesty in this case, clearly this would be a case where Mr. McClellan's dishonesty would have to be disclosed every time he was a witness as a trooper. It's critical for peace officers to have a level of integrity where they can appear as witnesses and be credible witnesses. And because of his actions in this case, these law enforcement officials were left with a very difficult decision to make, and that was to terminate his employment because he could no longer do his job and because they had lost confidence in him based on the way that he had come forward and provided what was not only a long line of dishonesty and fabrication, but allowed it to go over a duration of over two and a half months before it was ever cleared up. And so I'll reserve a couple of minutes. All right. Thank you, Mayotte Police Judges. Adam Levine on behalf of Rick McClellan. I would like to first start with something that was never really raised until the reply brief by the State, which is the Brady issue. First and foremost, the false statement was only the source of the what was otherwise correct information, which was that there was no complaint filed by Granite Construction. And, in fact, that was a true statement. While the district court in denying summary judgment said, I'm not sure whether it's true or not, there's a genuine issue of fact, both Major Sanchez, who was the person who spoke with Clark and Cooper, actually spoke with them, and Defendant Perry acknowledge in their depositions that, yes, the statement is correct. There was no complaint by Granite Construction. So it's a little tricky because it's sort of almost coincidentally turned out to have been, at least in your briefing, you described it as a true statement, which is as you just did. But when you mentioned Brady coming up only in the reply, I just want to give you every opportunity to respond, sir, because the first thing I thought of while reading the blue brief is Brady. And the reason for that is we see these cases all the time, of course. And so my definite understanding, please correct me if I'm wrong, is that this is absolutely Brady material that would have to be disclosed. So my question that I ask myself when I want to give you an opportunity to answer it is how could they not fire him? First, I would respectfully disagree that it is Brady material for the following reason. Brady material arises where you tell a false statement in the course of your duties as a peace officer. It is undisputed that the statement made by Rick McClellan regarding the source of his information was not made as a highway patrol trooper. It was not in connection with his job. It was undisputed and acknowledged by the defendants made in his capacity as a union president. All of them? So when he was talking to the Internal Investigation Office of Professional Responsibility, there didn't seem to be a dispute that he was speaking as an officer. Do you disagree with that? I do disagree, because Rick McClellan took the position, you have no right to use the coercive effect of Garrity v. New Jersey to bring me in and force me to answer questions that are not related to my duties as a peace officer, that are not related to my activities as an employee. The entire coercive mechanism of utilizing the disciplinary process for what he was told and was acknowledged ahead of time at the roundtable, you're going to be in uniform, but we acknowledge you are here as president of the union and there will be no discipline. Okay. So wait a minute. That that is that the September 1 meeting? Yes. That's the roundtable, yes. That's September 2. September 2. Your position is on September 2, he appeared there as the union person. And it was undisputed. He was told that it would be considered as such, and he was there in a union capacity as he was when he met with Colonel Almaraz on the first. What about the second roundtable on September 10? Still in his capacity as a union president. In other words, you cannot charge somebody with being dishonest and a Brady cop for something unrelated to their duties. If somebody is dishonest with their spouse and has an affair, that does not make them a Brady cop. It has to be related to the reason. I'm not talking about somebody having an affair. I'm talking about somebody testifying falsely under oath. Well, you want very different matter. We don't see police officers. I'm happy to say very often in this situation. Let's be clear about something. I've heard I heard the words under I keep hearing the words under oath when you are in front of internal affairs. You are not taking an oath as if you were testifying in a court. You swear to tell the truth. The whole truth. Nothing but the truth. But the entire process of utilizing the coercive mechanism of OPR to question him with regard to a statement made as a private citizen on a matter of public concern was in and of itself a violation. Please, please correct me. I want to make sure I understand this. On November 17th, did he take an oath? No. When you're in front of internal affairs, you are not sworn under oath. No. Did he sign something indicating that he verified the authenticity of his statement? What they do is they tell you, you are aware of the policy that you're required to answer questions truthfully. In other words, they are warned that they are being compelled under penalty of insubordination to answer questions. And if they don't, they will be subject to discipline up to and including termination. And they are reminded of their obligation under policy to tell the truth. But that policy. Okay. But not an oath. What? It's not an oath. No. But that policy itself that they're warned about says that they must be, tell the truth in connection with their official duties. The actual policy that they are warned of specifically states that you must be truthful in connection with the performance of your official duties. This entire case does not involve his official duties. Now, I do want to clarify something with regard to the evidence before the district court below, which it wasn't raised in the briefings, but I heard the question asked of my colleague about the other instances of dishonesty and were any of them under oath. Yes, some of those were actually under oath. Which ones, please? Bonnie Kendall, Sergeant Kendall, got a two-day suspension for testifying falsely before the parole board. That is testimony under oath. Falsely or incorrectly? Falsely. Let me say, your time is ticking. So there's a question here about prong two because the district court didn't reach prong two, right? And I asked the question out of the box about Brady and whether this should be a prong two analysis. There's also the prong one analysis, which is really zooms in, I think it's at 4-5 of the Dahlia question, whether there's a constitutional violation. Is it your contention that a jury could hear this evidence and decide that this person would not have been fired? Absolutely. How would that happen exactly? Because once it is established that he's speaking as a private citizen, which is undisputed, he was speaking as a union president, and the precedent is well established. When you speak on behalf of the union, you're a private citizen. That's September 2nd. It's a matter of public concern, which is that Robert Stepien is using his position as acting lieutenant to basically benefit his wife's employer and instruct her. Well, he wasn't acting in that capacity, as Judge Akuta clarified, in front of OPR. What about that? He's acting, and he testified later he was really just acting or speaking on his own behalf by the time he was having that interview. In OPR, but he would not have been in front of OPR but for his protected speech. In other words, he took the position in front of OPR, you don't have the right to question me here based upon my speech as a union president. You have a right to question me for what I did or what I do as a trooper. I'm not sure I understand your argument. So he conceded that he lied to OPR. He didn't say you don't have a right to question me, so I'm not going to answer your questions. He did not refuse because he was instructed that if he So is your position that somehow it's like the fruit of the poisonous tree, and therefore his lies shouldn't count against him? Absolutely. Because they had no right. In other words, it was a constitutional violation to haul him before the disciplinary apparatus. Forget the ultimate sanction of termination for a moment. By bringing him before a coercive disciplinary apparatus based upon speech made as a private citizen on a matter of public concern, that is a constitutional violation in and of itself. Go ahead. So we one of the prongs of determining this, whether there's a First Amendment violation, is the Pickering balancing test. So it would have to be the case that the state's interest in not having a officer who lied to OPR and who could not be trusted to tell the truth, I guess was what opposing counsel indicated. If that outweighs the employee's First Amendment rights. And so here, the state obviously has a strong interest in disciplining or terminating an officer who conceitedly lied to them. How is his First Amendment right at these OPR interview and other subsequent state lying statements? How does that outweigh? How does that balancing test work? It's interesting that you raise that, Judge, because it is well established that the truth or falsity of a statement is to be evaluated in the context of the Pickering balancing test. He conceded he lied, so there's no issue there. We know he lied to OPR. Correct. But again, he should not have been put in that position. He shouldn't have been there in the first instance. But he was, and he answered the questions, and he's admitted he answered them untruthfully. Right. And he ultimately came clean on it. But as indicated, the fact that they used this coercive mechanism improperly does not change the fact that he was always acting and speaking in his capacity as a union president. And as I pointed out in the briefing. But he said he wasn't at the last interview. He said he wasn't acting in that capacity. He was there because of speech made. In other words, you can't somehow change his status when the state improperly uses its coercive mechanism under threat of termination to make you come in and answer questions as union president. This is the fruit of the poisonous tree part. This is the fruit of the poisonous tree part. And it was, that issue was briefed to the district court. There was a case I cited in my opposition to the motion for summary judgment. I think it was out of Pennsylvania, talking about that you cannot use this coercive internal affairs mechanism improperly. It is in the state's motion for summary judgment itself. It did not place the Pickering balancing test into evidence. It presented no evidence in its actual motion. And remember, the burden under the Pickering balancing test is for the state to come forward with evidence of actual disruption, not real or hypothetical or actual. They didn't actually raise. We said that the Pickering balancing test is the burden is on the plaintiff to show that the balance is in his favor. That's a legal issue. That is a legal issue, but the burden of coming forward with the evidence of actual injury is actually on the defendant. Well, there's an obvious, and the state did indicate, there's an obvious interest in the state not to have an officer who lies to their internal investigation. And so the burden we've said is on the plaintiff to show that his First Amendment interests outweigh the state's legitimate interests. I would certainly assert that McClellan's First Amendment interest in not being subjected to the coercive mechanisms of internal affairs. And required him to lie? So he was subjected to the oppressive mechanisms of OPR, but did that require him to lie to OPR? Did not. But he, but it is, it is in fact the fruit of the poison tree. He would not have been in OPR, but for the fact that the state unlawfully retaliated against him because he came forward at a roundtable in his capacity as union president to point out that Lieutenant Stepien was giving instructions to Trooper Protein and by extension himself through showing him the memo that was a supervisor. You cannot escape the fact that he would not have been in front of OPR, but for the fact that there was a constitutional violation. I keep coming back, and this is where I started, with prong two, which the district court didn't reach. And there's different ways to slice and dice and analyze prong one of the qualified immunity analysis, but I haven't heard you respond to how it is possible that these defendants were in a position where it was clearly established that this wouldn't have required, or certainly at least allowed, them to terminate an officer who had testified falsely. What's the answer to that? The answer to the question is, is that the court found that under the fact it could not reach or assess the Pickering balancing test, and you cannot have a qualified immunity. Prong one, that's prong one. Yes. And I think it was at the Mount Healthy prong as to whether they would have fired him anyway. Right. The court says it's a genuine issue of material fact. Not Pickering. I'm sorry? It wasn't the Pickering prong. The district court relied on whether the other. Right. And there were other cases, by the way, where people were not fired, one of which was then-investigator Robert's testimony. But I'm interested in the answer to Judge Kristin's question also. So what case would make it clear to the State officials in this case, what case would make it clear that they couldn't terminate an officer who had lied to OPR? I don't know if I can cite to a case that said terminate, but I think it would be clear to every State official post-Pickering that once somebody speaks as a citizen on a matter of public concern, you could not even start and bring them through that coercive process at OPR. They think it's a Brady violation. Maybe they're wrong. They think it's a Brady violation, and they will have to produce this any time this individual testifies. Why doesn't that disqualify him from holding the job? It is because it is the fruit of the poisonous tree, and because other officers at the Department of Public Safety who did speak falsely, including one under oath, Sergeant Bonnie Kendall, including then-investigator Robert Stepien, before he promoted to lieutenant, where he made, he basically fabricated charges against Trooper Eric Thatcher and coerced false testimony out of Trooper Gesee. That was some of the underlying materials that were presented to the district court, yet they weren't fired. You agree that his supervisors could be wrong about this constitutional violation and still be entitled to qualified immunity? They can't be unreasonable, but they could be wrong. I don't believe that any supervisor could believe that taking a statement, an attribution as to source, there was no complaint, you know, because he got the information from the secretary as opposed to Cooper. I don't believe any reasonable supervisor could believe that they could then utilize that to take somebody through the coercive process of OPR, and that is a constitutional violation in and of itself. Okay. I think we have your argument. Thank you. Thank you. We have a few minutes for rebuttal. Counsel, how do you respond to the argument that he was speaking as a private citizen and a matter of public concern, that Brady wouldn't apply to a situation like that, similar to the trooper who has an affair and lies about it, something like that? Sure, and I think if you started and just looked at the first time he said something, I think you might be able to make that argument, although I've never seen a case where, in a circumstance like this, where an officer, even though he's wearing an association hat, lies to his supervisors that if that's sustained, that it's not a Brady issue. In fact, if that came to me as counsel for the department, we try to err on the side of being conservative about Brady material, not to try to hold stuff back, and that would be evidence to us that that individual had engaged in this. Even for an internal investigation. So say someone's stealing the coffee money at the break room, and they do an investigation. If someone lied about who was stealing it, that would be subject to Brady material, or is that over? He lied about this in the past? Right. I think it's important in this case to put into perspective how this occurred. The lies in this case and the investigation in this case didn't start because these administrators wanted to go after Mr. McClellan. It's because he identified folks that he said he talked to. Right. We understand that, but I think this is an important question, because I think I've misunderstood. I thought an oath had been given at the . . . I'm not sure if this matters, but I On the third occasion, was an oath given, and opposing counsel said no, and then failing that, there's a transcript. I don't know if he had to sign a transcript like you would in a deposition, for example. Could you clarify that for us, please? Yeah, what you'll find in the record, and I don't have the site right off hand, there are two admonitions that were signed by Mr. McClellan in which he had to sign indicating that he understood that if he was dishonest in this particular interview, that he would be terminated. So, in essence, he was told, you're in an interview, it's important to be, and critical that you're honest. He signed an admonition to that effect, and went ahead and lied, and doubled down on his lies. Okay, but that wasn't a deposition, right? The deposition transcript that we're reading is the deposition after the fact. And that's where he concedes this capacity, and whatnot. It's just the one deposition? Yes, of Mr. McClellan. And one last question about the Garrity issue. This is all for the Poisonous Trees Corp. He had no choice. He either showed up and gave statements, or he would be terminated. Right, and I appreciate that that argument's been made. I don't think it was fully argued below in terms of what Garrity would require. However, in this particular situation, and we have an officer who has started this investigation by a lie, follows up with a lie. He wasn't somehow transformed into being an association president, and not an employee when he was in that situation. He was talking to his command officers about that. And it's important that he tells the truth in those circumstances. I think what Mr. McClellan would have is a rule that says anytime you're in an association capacity, you have the right to lie. You can lie and you're protected, and there is no case that I could find on that. Believe me, I looked hard when we were looking at what to do in this case, on what protection, if any, there was for intentionally dishonest statements, even in an association capacity, and I couldn't find any case that supported that. So I would ask that you find that these defendants are entitled to qualified immunity, and thank you. We thank both sides for their argument. The case of Rick McClellan v. State of Nevada Department of Public Safety is amended.
judges: Ikuta, Christen, Morris